### UNITED STATES of America, Plaintiff-Appellee,

v.

### Clarence Everett WILKERSON, Defendant-Appellant.

### No. 71–1313.

United States Court of Appeals, Eighth Circuit.

Dec. 29, 1971.

Certiorari Denied April 17, 1972.
See 92 S.Ct. 1521.

James M. Moody, Little Rock, Ark., for appellant.

James R. Rhodes, Asst. Atty. Gen., W. H. Dillahunty, U. S. Atty., Fletcher Jackson, Asst. U. S. Atty., for appellee.

Before MATTHES and LAY, Circuit Judges, and HUNTER, District Judge.

HUNTER, District Judge.

On June 1, 1970, two men at gunpoint robbed the Bryant Branch of the Union National Bank of Benton, Arkansas. Clarence Everett Wilkerson, appellant, and Bobby Joe Faubion were arrested and charged with the crime. While in jail both men gave statements admitting the bank robbery. As a result of a jury trial on April 27, 1971, appellant Wilkerson was found guilty and later sentenced to a substantial term of imprisonment.[1]

On this appeal, in forma pauperis, appellant raises three contentions of reversible error: (1) the overruling by the trial court of appellant's motion to suppress his confession of October 10, 1970; (2) the trial court's refusal to exclude at the trial identifications allegedly made as a result of an unduly suggestive lineup; and (3) the trial court's refusal to declare a mistrial because of the exposure of some of the jury panel of appellant dressed in jail clothes while wearing handcuffs and leg-irons and accompanied by armed guards. After careful review of the transcript, briefs and oral argument, we affirm.

### The Confession Contention

On June 4, 1970, appellant and Faubion were arrested in Louisiana in connection with crimes they allegedly committed in that state which are not involved on this appeal. While awaiting trial on those charges, they were confined in the same jail in Rayville, Louisiana, from June 4, 1970, until October 25, 1970. During that confinement both men confessed their involvement in the bank robbery and implicated Linda Wilkerson, appellant's wife. Appellant claims his confession was not a true statement and was involuntary because it was given only on the condition that his wife be arrested.

In the evidentiary hearing on the motion to suppress the confession, appel-

1. Bobby Joe Faubion earlier pleaded guilty and is currently serving the sentence imposed on him. The evidence against appellant was strong and obviously persuasive.

lant testified that the sole reason he confessed to the bank robbery was to implicate his wife, whom he wanted arrested and placed in custody because he was angry with her and so that he could subpoena her to Louisiana to testify in his aggravated kidnap charge pending there.[2]

Appellant's testimony that he confessed to F.B.I. Agent Fay only on condition his wife be arrested was refuted by Agent Fay who testified he told appellant that no promises or special handling would or could be promised by the F.B.I., and that any information given would be furnished to the appropriate United States Attorney for prosecutive evaluation. In ruling that the confession was voluntarily given, the trial court noted that the purpose for giving the confession was one which originated with the defendant and his cellmate, and that it did not appear to have been inspired or induced by any misrepresentation made by any law enforcement officer.

■ Appellant does not contend that the confession was coerced from him or that the *Miranda* warnings were not adequately and timely given. Rather, he makes the unique argument that inasmuch as he confessed in order that his wife be arrested and taken into custody so as to be available to be subpoenaed as a witness in another case against him the confession was involuntarily given. Under any view of the facts before the trial court it is clear that appellant's will was not overcome at the time he confessed, and that the trial court did not err in so finding. Compare Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); Grooms v. United States, 429 F.2d 839. Appellant's contention concerning involuntariness is plainly frivolous.

### The Unduly Suggestive Pictures and Lineup Contentions

■ Appellant contends the F.B.I.'s use of photographs during the investigative stage approximately eleven months before the lineup, tainted the lineup and his identification. The uncontroverted testimony of F.B.I. Agent Cotterman was that he interviewed bank employees shortly after the robbery and showed them an album that contained approximately fifty pictures of various people who might be suspects. The album did not contain a picture of appellant. It did contain one of Faubion, and one employee picked it as a picture of one of the robbers. In the absence of evidence indicating that the lineup identifications were induced by the picture album, appellant's contention is totally devoid of merit. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1968).

Appellant also contends the trial court erred in overruling his motion to suppress testimony of certain of the government's witnesses obtained on the basis of the lineup for the reason the lineup was unduly suggestive. His counsel stated that three of the men in the lineup did not resemble appellant, and that appellant was required to put on a hat and glasses.

Including appellant, there were six men of varying heights and weights in the lineup. Each of the six in the lineup, one at a time, was required to put on sunglasses and a hat. Neither the hat nor the sunglasses were the ones used in the robbery. Nine prospective witnesses, as well as appellant's counsel, viewed the lineup the day preceding the trial. No prospective witness was told whether he was being asked to possibly identify appellant or Faubion. Appellant had light hair and was taller than Faubion

2. Appellant testified: "I called the people up (sheriff's officers) and told them I wanted to make a statement. I wanted to get my wife locked up." * * * "I made it clear to them that the reason I wanted to give this statement was with the understanding she would be arrested and subsequently be in position where we could subpoena her to Rayville to testify for us and so I could get my business straight with her." Appellant said she had run off with another man, and with his clothes, car and money.

who had dark hair. Immediately after the lineup, with the cooperation of the prosecuting authorities, appellant's counsel examined in deposition form each of the potential witnesses. At the trial three courtroom identifications of appellant were made over his counsel's objection.

It is well settled that any lineup to which an accused is submitted must meet due process standards of fundamental fairness and not be arranged in such a way as to be impermissibly suggestive as to the person pointed out by the witness. Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Simmons v. United States, supra. Any lineup procedure which is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable mistaken identification amounts to a denial of due process and the results should be excluded from evidence. In each case the possibility of unfairness must be examined in the contest of the totality of the circumstances. Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

It would serve no useful purpose to further detail the evidence describing the lineup. The trial judge had in evidence a photograph of it. The appellant was ably represented at the lineup by his counsel. Nothing was said or done to focus attention on him. United States v. Wade, 388 U.S. 18, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Viewed in its totality the lineup was not unduly suggestive. There was no denial of due process or of any other constitutional right. Compare Utsler v. Erickson, 440 F.2d 140 (8th Cir. 1971); Searles v. State of Minnesota, 428 F.2d 1188 (8th Cir. 1970).

### Contention Concerning Appellant's Prejudicial Exposure to Jury

At approximately 9:00 a.m. on the morning of the trial appellant, dressed in blue jeans and white shirt, while being taken to the marshal's quarters where he was to change to better clothes, was escorted by two guards armed with shotguns down a corridor near the courtroom where the trial was to take place. Appellant was handcuffed in front to a waistchain and had leg shackles on. Thirty-seven people had been summoned to the courtroom that morning as the jury panel. During oral argument appellant's counsel advised that many of the jury panel upon arrival ordinarily go into the courtroom and take seats there. Some who wish to smoke remain in the corridor near the courtroom door as do spectators who wish to smoke. As appellant reached that part of the corridor near the courtroom door he heard the bailiff calling for prospective jurors to enter the courtroom. Appellant's counsel called this situation to the attention of the trial judge, who suggested the matter be taken up "after we have made the jury". Of the thirty-seven members of the jury panel present only twenty-eight were called for voir dire examination.

Upon completion of that examination and the selection of the jury, but before anything further was done, an evidentiary hearing on appellant's then made motion for a mistrial was held concerning appellant's contention that several of the jurors probably saw him in the hallway enroute to the marshal's quarters. Appellant testified that he got off the elevator and as he neared the front of the court entrance, "there were several people out there, and I heard someone say, 'The prospective jurors, please come in here.'" * * * The Court: "The jurors have indicated on voir dire that they did not know the defendant, never had seen him before they came to court here this morning, and that they had no bias or prejudice one way or the other against the defendant or against the man charged with this particular crime." Appellant's counsel elected not to request the trial judge during voir dire to ask additional questions touching the question of whether any of the twenty-eight prospective jurors had actually

seen appellant in the corridor that morning, or whether they had any prejudice from any incident they may have witnessed in the corridor that morning. Nor after the jury was selected did he request any additional action to ascertain whether any juror had witnessed the described event. The trial judge speculated that some of the (thirty-seven member) panel "likely" saw appellant but that in the absence of any showing that any juror had seen appellant that morning or had any prejudice against appellant he would overrule appellant's motion for a mistrial.

Thus, it was never established that any juror actually saw appellant so attired, manacled and accompanied.[3] The several members of the panel who may have seen appellant could have been one or more of the twenty-five panel members who were not selected on the twelve member jury. Appellant's counsel, who had the burden of proof on his motion to declare a mistrial, had ample opportunity to establish which members of the panel, if any, had seen appellant in the corridor or that some of the jury had so seen appellant, and for reasons of trial strategy chose not to do so. See Mallonee v. Lanier, Warden, 354 F.2d 940 (5th Cir. 1966). The resulting lack of any evidence that any juror had witnessed the incident, coupled with the jurors' statement on voir dire that they had never seen appellant before they came to court that morning and had no bias or prejudice against him, presents a situation in which we are unwilling to find that the trial judge erred in refusing to declare a mistrial.

Having reviewed all of appellant's contentions and based on our conviction that they lack merit, the judgment below is affirmed.

---

3. From oral argument it appears undisputed that defendant had to be taken the route used to get him to the marshal's area. While this is no justification for ever improperly exposing an accused to a jury panel, it is indicative of lack of bad faith on the part of the prosecutor in the particular incident and appellant's counsel does not charge bad faith.